**364 P.2d 409**

**STATE of Utah, Plaintiff and Respondent,**

**v.**

**Paul L. NELSON, Defendant and Appellant.**

**No. 9287.**

Supreme Court of Utah.

Aug. 24, 1961.

Hanson, Baldwin & Allen, Merlin R. Lybbert, Salt Lake City, for appellant.

Walter L. Budge, Atty. Gen., Vernon B. Romney, Asst. Atty. Gen., for respondent.

McDONOUGH, Justice.

Defendant appeals from a jury verdict finding him guilty of automobile homicide in violation of Title 76, Chapter 30, Section 7.4, Utah Code Annotated, 1953.

The evidence shows that at approximately 7:45 p. m. on the evening of November 14, 1959, the defendant, while driving northward out of Salt Lake City on Highway 91, ran a red light at the intersection of Highway 91 and Cudahy Lane in North Salt Lake and successively struck two automobiles which were proceeding in the intersection with the light in their favor, one from the east and the other from the west. He first struck the left rear of a car which came from the east and turned to its left, southward on Highway 91; he then proceeded on into the side of the second car, which was crossing the intersection from the west, driven by one Floyd James, who suffered severe injuries from which he died within a few hours.

The defendant's car laid down 62½ feet of skid marks prior to colliding with the first car, plus 25½ feet of skid marks prior to the point of impact with the James vehicle. Following the impact, defendant's car skidded an additional 70½ feet before coming to rest on the east shoulder of Highway 91. The James vehicle was thrown 103 feet to the northeast, taking out a four-inch steel traffic control post in the process.

From the physical findings the defendant's speed was computed by an officer, who qualified as an expert at the trial, to have been "just a fraction over 88 miles per hour." That the defendant was traveling at a very high rate of speed was corroborated by another witness, Lester A. Blackner, who was traveling in the same direction [northward] as the defendant. He testified that as he approached the traffic light it was red, and further:

"* * * and then the Cadillac convertible [defendant's car] passed me on my left side, way out wide, and was traveling approximately double my

speed, and I was going 40 to 45 miles per hour at that time. And it was way out in the southbound traffic area when he passed. He'd gone over the divided lines in the highway, and the car was accelerating even at the time it passed me."

The defendant had been drinking throughout the afternoon prior to the accident, and, because of the alcohol on his breath, following the accident he was taken by Officer Gary Schmidt of the Utah Highway Patrol and a deputy marshal of North Salt Lake to Saint Mark's Hospital in Salt Lake City for the purpose of having him submit to a blood-alcohol test. At the hospital Officer Schmidt made arrangements to have the laboratory technician take it. The defendant repeatedly refused to sign the form permitting such a test, but finally consented to give a sample of his urine. After this was accomplished he was driven back to the scene of the accident where he was placed in the custody of Marshal Roy A. Reynolds of North Salt Lake, who then took him to the home of E. S. Arbuckle, a Justice of the Peace, to get a "commitment to lodge him in the Davis County Jail," upon a charge of driving while intoxicated.

The matter of critical moment on this appeal relates to what occurred when the defendant was first taken before Justice of the Peace Arbuckle as testified to by the latter at the trial in the district court. He related that he was aroused from bed by the officers bringing the defendant in and stated:

"And when they started up the three steps to the house this man [the defendant] stumbled * * *. He grabbed the rail and he walked up in an unsteady manner. And I told him to come in the house * * *. He was a little awkward to get around to the chair—acted like he couldn't see it * * *. And I talked to him—Mr. Nelson—and asked him if he'd been drinking, and he said yes. And I asked him how much, and he said two beers, a vodka and some whiskey. And then I talked to him a minute or two and asked him why he was driving— why was he trying to run a red light, and I said to him, 'How many did you say you had?' And he said, 'I had about four beers and two or three vodkas,' that time. And he was talking so you could hardly understand what he was saying. He was very thick-tongued and you couldn't hardly understand what he said. We talked there awhile and we decided that we'd better lock him up for the night until he sobered up, and then bring him back so's he could talk so we could understand what he said, and so he could understand us."

Three days later, on November 17, 1959, following the death of Floyd James, the defendant was charged before another Justice

of the Peace, Leonard Winegar, with the offense of automobile homicide. A preliminary hearing was set for November 21, 1959, before Justice Winegar. At that time the defendant appeared and was represented by his then counsel. The hearing was had without any objection being voiced to antecedent proceedings, and he was bound over to the district court for trial. No objection was raised at the time of his arraignment in the district court. When the case came on for trial, the court asked if the parties were ready, to which defendant's counsel replied: "We are ready." The trial was then had and a verdict of guilty rendered.

■ The defendant seeks reversal of his conviction on the ground that he was deprived of rights assured him under the Fourteenth Amendment of the U.S.Constitution, and Sections 7 and 12 of Article I of the Utah Constitution, because he was taken into custody and kept in the presence of police officers and a magistrate and questioned concerning his conduct during the first two hours following the accident without being advised of his right to the aid of counsel, or that his statements might be used against him.

Particularly, he complains that the Justice of the Peace failed to comply with Section 77–15–1, U.C.A.1953, which requires that:

"When the defendant is brought before the magistrate upon an arrest, either with or without a warrant, on a charge of having committed a public offense triable on *information* or *indictment*, the magistrate must immediately inform him of the charge against him and of his right to the aid of counsel in every stage of the proceedings." (Emphasis added.)

From the language of the statute just quoted, which applies specifically to public offenses triable on information or indictment, that is to serious crimes, felonies or indictable misdemeanors, it is apparent that the legislature did not intend that requirement to be an indispensable necessity in regard to all minor misdemeanors. However, assuming that in the instant case it would have been proper procedure for Justice Arbuckle to have advised the defendant of his right to counsel, we fail to see how he can properly complain of prejudicial error; nor do we perceive wherein he was unjustly convicted.

It is to be borne in mind that the requirement under discussion and other cognate rights of an accused [1] are established for the salutary purpose of preventing police-

---

1. Sec. 12, Art. 1, Utah Constitution assures the rights: To appear and defend, to know the accusation, to testify, or to refuse to do so, to be confronted by witnesses; to have his own witnesses; to have a speedy trial by jury and the right to appeal.

men or public officers from abusing their authority by imposing upon or taking undue advantage of one suspected of crime. But some common sense must be used in applying such protections for that purpose, and care must be exercised that these requirements of the law are not so twisted around as to provide a protective cloak for the guilty and so hamstring law enforcement officers that they are unable to properly investigate suspects and if warranted, prosecute them for crimes committted.

We do not disagree with the proposition that under some circumstances where it might appear that an accused had in fact been imposed upon or taken undue advantage of, the failure to inform him of his right to counsel and to warn him that his statements may be used against him might result in such fundamental unfairness to him as to justify a holding that he had been deprived of due process of law and warrant a reversal of a conviction.[2] But our real concern is not whether the Justice of the Peace followed precisely a ritual urged as necessary by defense counsel in giving the defendant a lecture on his constitutional rights. It is whether in surveying the entire picture of what happened, it appears that the defendant was in fact taken undue advantage of or imposed upon in being tricked or coerced into making admissions which he otherwise would not have made or was in any manner deceived or kept ignorant of the charge against him, or deprived of a full and fair opportunity to meet and contest it.

In regard to that fundamental proposition this is to be said: it appears affirmatively from the record that the defendant was not in anyway misused, or imposed upon, or taken undue advantage of. Inasmuch as he appeared to Officer Schmidt to be intoxicated, the latter properly proceeded to take him into custody and to the hospital.[3] Upon being requested to give a blood test, the defendant was sufficiently wary of his rights that he persisted in refusing four different requests to sign the permission to do so, which refusal was accepted. However, he willingly agreed and gave a sample of his urine. There is no suggestion nor intimation in the record that he was unwilling or even hesitant to talk to the Officer or to the Justice of the Peace, but he seems to have been voluble enough in conversing with them.

It is readily conceded that the conduct of the Justice of the Peace was less than exemplary. His questioning of the de-

---

2. People v. Hickok, 96 Cal.App.2d 621, 216 P.2d 140; Uveges v. Commonwealth, 335 U.S. 437, 69 S.Ct. 184, 93 L.Ed. 127; Quicksall v. People, 339 U.S. 660, 661, 70 S.Ct. 910, 911, 94 L.Ed. 1188.

3. See Sec. 41–6–44.10, U.C.A.1953. That statute is dealt with in Bean v. Dept. of Public Safety, 12 Utah 2d 76, 362 P.2d 750.

fendant was out of character for a judge, it was improper and uncalled for. What effect such impropriety might have had upon the admissibility of the Justice's testimony, had there been objection to it, we are not concerned. He was called as a witness and testified without objection from the defendant. Our survey of the record leads us to surmise that this failure to object may well have been advised because of the thought that the testimony of the Justice of the Peace would do the defendant no harm and might actually help his cause. In any event, the defendant elected to allow the testimony without objection and cannot now complain if he guessed wrong. We here note that we do not disagree with the contention that even in the absence of an objection this court might nevertheless take note of and correct an egregious error. But this could properly be done only in an unusual case where there was some substantial error unobjected to by inadvertence or neglect of counsel and where it was of such critical importance that it appears likely that an unjust conviction resulted therefrom. Such is quite plainly not the case here. The only possible effect of Mr. Arbuckle's testimony adverse to the defendant related to intoxication. In that regard the State called a dozen other witnesses, including several law enforcement officers and the ambulance and hospital personnel, all of whom observed the defendant at close range, and who testified concerning his intoxication. Upon the basis of such evidence we do not believe that there is any likelihood that the verdict would have been different in the absence of Mr. Arbuckle's testimony.

In regard to the defendant's attack on his conviction of automobile homicide this further consideration is significant: when he first appeared before Justice of the Peace Winegar on that charge he was represented by counsel and has been so represented at all stages of the proceeding since. Neither then, nor at the preliminary hearing, nor at the trial, did the defendant or his counsel voice any objection to going forward with the proceedings, or as to Justice Arbuckle's failure to advise the defendant of his rights, or of the admission of the latter's testimony. It would be manifestly unfair to the interests of the State and disruptive of the orderly processes of law enforcement to permit an accused to thus go forward and participate in a trial, attempting to obtain a favorable verdict, and then after it goes adverse to him, come forward with a claim of some antecedent error or irregularity which was known to him prior to the trial, contending that such error was fatal and that the verdict rendered was invalid anyway. This court stated in the case of State v. Gustaldi:

"Orderly procedure, as well as the rules of practice, requires that unless objections are timely interposed, all irregularities if any occur at the preliminary examination and preceding the

filing of the information, * * * must be deemed to be waived." [4]

We have reviewed defendant's assignments of error for failure to give requested instructions. It is necessary only to say that the matters included in the requests were adequately covered in the instructions given.

Affirmed.

WADE, C. J., and HENRIOD, CALLISTER and CROCKETT, JJ., concur.

---

4. 41 Utah 63, 123 P. 897, 900. See also Ex parte Tedford, 31 Cal.2d 693, 192 P.2d 3; People v. Miller, 123 Cal.App. 499, 11 P.2d 884; People v. Hickok, 96 Cal.App. 2d 621, 216 P.2d 140.